1   Robert C. Weiss (State Bar No. 39929)
    robertweiss@rcwlaw.com
2   LAW OFFICES OF ROBERT C. WEISS
    3770 Highland Avenue, Suite 203
3   Manhattan Beach, CA 90266
    Telephone: (310) 545-9854
4   Facsimile: (310) 545-9853

5   Theodore S. Maceiko (State Bar No. 150211)
    ted@maceikoip.com
6   MACEIKO IP
    3770 Highland Avenue, Suite 207
7   Manhattan Beach, CA 90266
    Telephone: (310) 545-3311
8   Facsimile: (310) 545-3344

9   Michael L. Meeks (State Bar No: 172000)
    mmeeks@buchalter.com
10  Carol A. Dwyer (State Bar No. 239769)
    cdwyer@buchalter.com
11  BUCHALTER NEMER
    A Professional Corporation
12  18400 Von Karman Avenue, Suite 800
    Irvine, CA 92612-0514
13  Telephone: (949) 760-1121
    Facsimile: (949) 720-0182

14
    Attorneys for Plaintiff, Counter-defendant,
15  COMPULINK MANAGEMENT CENTER, INC.
    dba LASERFICHE

16

17              UNITED STATES DISTRICT COURT

18             CENTRAL DISTRICT OF CALIFORNIA

19

20  COMPULINK MANAGEMENT              Case No. 2:10-CV-7843-JFW(Ex)
    CENTER, INC. dba LASERFICHE,
21                                    PARTIES' JOINT STATEMENT RE:
                                      COMPULINK'S MOTION IN
22         Plaintiff,                 LIMINE #1: TO EXCLUDE EXPERT
                                      REPORT AND SURVEY BY DR. JAY
23         vs.                        AND TESTIMONY CONCERNING
                                      SAME
24  SAP AMERICA, INC., SAP AG, SAP
    GLOBAL MARKETING, INC., and
25  Does 1 through 10,

26         Defendants.

27  SAP AMERICA, INC., and SAP
    GLOBAL MARKETING, INC.,

28

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 9790819v1                          1

| | |
|---|---|
| Counterclaimants, | PT Conf. Date:    Sept. 2, 2011 |
| vs. | Hearing Date:     Sept. 9, 2011 |
| COMPULINK MANAGEMENT CENTER, INC dba LASERFICHE, | Trial Date:        Sept. 20, 2011 |
| Counter-defendant. | |

Pursuant to §5 ("MOTIONS IN LIMINE") of the court's Scheduling and Case Management Order (Doc. #23), each party herein sets forth its respective position, as follows, regarding **COMPULINK'S MOTION IN LIMINE #1:  TO EXCLUDE  EXPERT REPORT AND SURVEY BY DR. JAY AND TESTIMONY CONCERNING SAME.**

## COMPULINK'S POSITION

SAP has furnished a report signed on June 13, 2011, and a rebuttal report signed July 5, 2011, by E. Deborah Jay, Ph.D., who has been identified by SAP as an expert to testify on the issue of whether RUN SMARTER has secondary meaning in connection with software of the type at issue here. Despite the arguments of SAP regarding relevance, the survey is not a likelihood of confusion survey.  It is also not a survey on genericness or descriptiveness.  Dr. Jay makes it clear that the survey only goes to secondary meaning.

The reports disclose that Dr. Jay's opinion is based on a telephone survey. The reports, and any testimony by Dr. Jay based thereon, should be excluded because the survey, and therefore her testimony based thereon, fail to meet the reliability criteria of FRE 702 as elucidated by *Daubert v Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), *Kumho Tire Co. v Carmichael,* 526 U.S. 137 (1999) and their progeny.

Moreover, even if the survey could be found to meet the test of FRE 702, it still would be improper to admit Dr. Jay's testimony on the topic of that survey –

1    secondary meaning – without careful attention to the question how and why that

2    issue is relevant.  This is so because, in a registered-trademark case, the question

3    whether the mark has acquired secondary meaning is of dubious relevance at best,

4    and possibly of no relevance at all.

5         A.     **The Jay Survey, And Any Testimony About It, Should Be Ruled**

6             **Inadmissible Under FRE 702**

7        The Jay survey purports to prove that RUN SMARTER lacks secondary

8    meaning, in that the public fails to associate it with Compulink or Laserfiche.  The

9    survey, however, is procedurally flawed to the extent that it fails to meet the

10    reliability criteria of FRE 702 as elucidated by *Daubert v Merrell Dow*

11    *Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), *Kumho Tire Co. v Carmichael,* 526

12    U.S. 137 (1999) and their progeny.  FRE 702, which amounts to a codification of

13    the *Daubert/Kumho* criteria, provides:

14            If scientific, technical or other specialized knowledge will

15            assist the trier of fact to understand the evidence or to

16            determine a fact in issue, a witness qualified as an expert

17            by knowledge, skill, experience, training, or education,

18            may testify thereto in the form of an opinion or otherwise,

19            if (1) the testimony is based upon sufficient facts or data,

20            (2) the testimony is the product of reliable principles and

21            methods, and (3) the witness has applied the principles

22            and methods reliably to the facts of the case.

23        As regards surveys specifically, the following criteria have been endorsed by

24    the Federal Manual for Complex Litigation (4th ed., §11.493):

25            The sampling methods used must conform to generally

26            recognized statistical standards.  Relevant factors include

27            whether:

28            •     The population was properly chosen and defined;

1    •     The sample chosen was representative of that population;

2    •     The data gathered were accurately reported.

3        In addition, in assessing the validity of a survey, the judge

4    should take into account the following factors:

5    •     Whether the questions asked were clear and not leading;

6    •     Whether the survey was conducted by qualified persons

7        following proper interview procedures; and

8    •     Whether the process was conducted so as to ensure objectivity

9        (e.g., determine if the survey was conducted in anticipation of

10       litigation and by persons connected with the parties or counsel

11       or by persons aware o its purpose in the litigation).

12       Moreover, "[t]he definition of the relevant population is critical because there

13   may be systematic differences in the responses of members of the population and

14   nonmembers. (For example, consumers who are prospective purchasers may know

15   more about the product category than customers who are not considering making a

16   purchase)." Federal Reference Manual on Scientific Evidence, 2d ed., p. 240.

17       Finally, good survey practice requires that any discrepancy between the

18   survey population and the target population be discussed and its effect evaluated.

19   Per Federal Reference Manual on Scientific Evidence, 2d ed., p. 240,

20       The survey report should contain a description of the

21       target population, a description of the survey population

22       actually sampled, a discussion of the difference between

23       the two populations, and an evaluation of the likely

24       consequences of that difference.

25       Courts often rule, and we anticipate that SAP will urge this Court to rule

26   here, as to the Jay survey, that "methodological flaws [should] … go to the weight

27   accorded to the survey, not its admissibility" (*Icon Enterprises International, Inc., v*

28   *American Product Company,* 2008 U.S. Dist. LEXIS 31080 (C.D. Cal., October 7,

2004), at *84); but to this statement, which cannot really be called a rule, there are many exceptions. If the flaws are serious enough, that will "make any reliance on the survey unreasonable" (*id., citing Scott Fetzer Co. v House of Vacuums, Inc.,* 381 F. 3d 477, 488 (5th Cir. 2004)). Thus in the *Scott Fetzer* case, a survey offered by plaintiff to demonstrate confusion was held insufficient to raise a triable issue, and summary judgment was held to have been properly granted for defendant despite plaintiff's survey, the principal flaw of which was the selection of an inappropriate survey universe.

Similarly, in *Kournikova v General Media Communications,* 281 F. Supp. 1111 (C.D. Cal. 2003), a case involving the publication of pictures in *Penthouse* magazine of a woman whom the magazine falsely identified as Ms. Kournikova, a survey was offered by plaintiff in an attempt to demonstrate that "reasonable consumers" upon seeing the publication would believe that Ms. Kournikova had voluntarily associated herself with the magazine. The survey was held inadmissible because it was "fundamentally flawed" in two ways: First, only a small percentage of the survey population (fewer than 10% of respondents had purchased *Penthouse,* fewer than 25% had purchased *Playboy*) actually were recent purchasers of a magazine of the relevant genre; and second, respondents were not allowed to see the complained-of matter in context; they were only allowed to view photos of the magazine's cover and spine – not the magazine photos themselves, nor the accompanying article. *Id.* at 1125.

A serious enough deficiency in the choice of the survey universe can render the survey not merely unreliable but actually irrelevant: "A survey that provides information about a wholly irrelevant universe of respondents is itself irrelevant." *Reference Manual on Scientific Evidence* (Federal Judicial Center 2000), p. 241.

Moreover, even if a survey has some relevance and some probative value, it may still be appropriate to exclude it under F. R. Ev. 403. As stated in *Simon Property Group L.P. v mySimon, Inc.,* 104 F. Supp. 2d 1033, 1039 (S.D. Ind. 2000),

1  The court need not and should not respond reflexively to every

2  criticism by saying it merely "goes to the weight" of the survey rather

3  than to its admissibility. If the flaws in the proposed survey are too

4  great, the court may find that the probative value of the survey is

5  substantially outweighed by the prejudice, waste of time, and

6  confusion it will cause at trial.

7  As we shall demonstrate, the Jay Survey fails to meet the FRE 702 criteria

8  because it fails to meet the standards for sound survey practice.  Many of its defects

9  and flaws are explored in the Expert Rebuttal Report of Dr. John Burnett and

10  Fernando Torres dated July 5, 2011 (hereinafter "Compulink's Rebuttal Report"), a

11  copy of which is attached hereto as **EXHIBIT A.**  With or without benefit of

12  Compulink's Rebuttal Report, the fatal defects of the Jay Survey are apparent.

13  Against this background we turn to a specific examination of the Jay survey,

14  which is fatally defective in at least the following ways:

15  **1.      The Survey Failed To Reliably Identify – And In Fact**

16  **Missed Almost Entirely -- The Relevant Universe of**

17  **Potential Purchasers of the Software in Question**

18  **a.      The Survey Arbitrarily Focused On Companies Far**

19  **Too Small To Be Relevant**

20  The Jay Report states that "companies with 10 or more employees" were

21  selected for the survey because, in the words of the Jay Report, "I understand that

22  these companies are more apt to buy, license or upgrade the relevant types of

23  software products than are smaller companies" (p. 7).  No basis for Dr. Jay's

24  understanding in this regard is disclosed.

25  The reported choice of a 10-employees "floor" also was nonsensical.  As

26  Compulink's Rebuttal Report explains (pp. 2-4), companies as small as 10

27  employees would be highly unlikely to require, or have use for, the highly

28  sophisticated software Compulink (and SAP) sell.  The main buyers of ECM

1   (enterprise content management) software are the Government and large

2   businesses, whose "key driver of market demand is regulatory compliance."

3   Indeed, 91% of the ECM software market consists of enterprises of 100 employees

4   or more.  Yet the Jay Report fails to disclose how many of the sampled companies

5   had 100 employees or more, or even 50.  In fact, only 37% of the companies

6   sampled in the Jay Survey had over 25 employees (see Compulink Rebuttal Report,

7   p. 3 n7).

8          Manifestly, Dr. Jay's reported decision to sample companies having as few

9   as 10 employees – and to sample *mainly* companies having far fewer than 100

10  employees – resulted in such a severe distortion of the market it aimed to survey

11  that the survey must have missed the pertinent population almost entirely.  This,

12  without more, renders the Jay Survey hopelessly unreliable.

13         Even worse, Dr. Jay's reported decision to sample companies as small as 10

14  employees is not supported by any meaningful explanation at all.  The report does

15  not indicate that she performed any study or analysis to ascertain the sizes of

16  enterprises that would likely have an interest in, or purchase plans or experience

17  with, the relevant software; she simply does not say what caused her to believe that

18  a minimum company size of 10 was appropriate.  In this, the survey universe was

19  defined in a way that seems to have been wholly speculative and conjectural.

20  Expert opinion resting on no better basis than that should be excluded.  *Major*

21  *League Baseball Properties, Inc. v Salvino, Inc.,* 542 F. 3d 290, 311 (9th Cir. 2008),

22  *quoting Boucher v U.S. Suzuki Motor Corp.,* 73 F.3d 18 (2d Cir. 1996) to the effect

23  that proffered "expert testimony should be excluded if it is speculative or

24  conjectural" and that the "[a]dmission of expert testimony based on speculative

25  assumptions is an abuse of discretion" (*id.* at 21-22).

26

27

28

**b.**   **The Survey Universe Was Further Distorted By Over-Broad and Ambiguous Definitions of the Relevant Software**

In addition to its failure to focus on appropriately large companies, the Jay Survey also failed to focus accurately on the *relevant kind* of software.  This is so because the interviewers' descriptions of that software were so vague as to be grossly over inclusive – and therefore poorly designed to identify those interviewees, and *only* those interviewees, within the respondent companies who would have been involved with the relevant software.  The Jay Survey's product definition (see Jay Report, p. 9) ranged from "document or records management software" to "document imaging or forms capture software," to "enterprise content management software (defined so loosely as to embrace any software that "allows employees to access and share your company's stored electronic data") was grossly over-broad.  Its over-breadth was worsened, moreover, by the fact that the survey question, in speaking of "enterprise content management software," redefined an industry term of art.  (See Compulink's Rebuttal Report, p. 7.)[1] It also failed to mention any price range for the software in question, leaving respondents in doubt whether million-dollar or hundred-dollar installations were the subject of the inquiry.

The Jay Report's definition of the relevant software was indeed so broad that it would "qualify," for example, interviewees whose only software-selection experiences have been with the kinds of mass-market software that are widely sold to general-consumer-type users (individuals and non-business users) – e.g., Microsoft's Windows®  and Word® software, or Quicken® check-writing software, or Turbo-Tax® tax preparation software, or even any garden-variety e-mail support software that would allow users to attach and forward documents.

---

[1] Dr. Jay admitted during her deposition that she was the author of these definitions and did not rely upon any authoritative work to create the definitions.

1    This over-broad product definition caused the "survey universe" to include persons

2    atypical of those who purchased or were potential purchasers of the type of

3    software sold under the RUN SMARTER mark by Compulink.

4        As Compulink's Rebuttal Report explains (pp. 5-6), software of the type in

5    question here is typically purchased by IT professionals within organizations of

6    substantial size, and the general public, or even the respondent company's rank-

7    and-file employees, might have a very different understanding of the scope of the

8    definitions than those professionals do.  Yet the Jay Report reflects that the vast

9    majority (73%) of the Jay Survey respondents had job titles that were not IT-

10   specific, and 45% were self-described CEOs, presidents and owners of businesses,

11   suggesting a high likelihood that the companies were either too small to count or

12   that the interviewees had only a high-level, non-specific understanding of the topic.

13   Notably, the survey included no question to prompt the interviewee to confirm that

14   he or she understood the question; and the survey questions were not, so far as the

15   Jay Report shows, pre-tested in any way to ascertain that they would communicate

16   understandably.

17       Given these defects, there is little reason for confidence that the Jay Survey

18   succeeded in identifying the respondent companies that actually had dealt or would

19   deal with the pertinent software, and the appropriate interviewees within those

20   companies.

21       **2.      The Survey Failed to Reliably Indentify the Relevant**

22              **Decision makers Within the Respondent Companies**

23       Even if the Jay Survey could be said – though it cannot – to have employed

24   reliable means to identify the organizations that were actually in the market for the

25   software of concern here, it could not be said that it reliably identified the

26   *individual interviewees* within those organizations who were best positioned to give

27   evidence as to the relevant public's awareness of the RUN SMARTER trademark.

28   Especially in a smaller company, the CEO, president or owner may sign off on

1  purchase requisitions; he or she may even sign, personally, the checks for all

2  significant purchases; but that does not mean that he or she is the person who best

3  understands what is being purchased and why.  It does not mean that he or she

4  personally reads IT-related trade periodicals, much less does it mean that he or she

5  personally did whatever product research led up to the purchase.  Still less does it

6  mean that he or she otherwise was personally exposed to whatever trademarks,

7  advertisements, commercial slogans, product labels and the like are actually

8  associated with the products of interest and other products in the relevant market.

9      Moreover, as Compulink's Rebuttal Report explains (p. 4), in the case of

10  technology-based purchasing, the procurement process is apt to be a collaborative

11  process, involving groups rather than individuals:  IT-knowledgeable personnel will

12  survey the market and evaluate alternatives and make recommendations; but they

13  may not be the persons with power to decide what software will be used by the

14  company.

15      These matters are potentially significant obstacles to accurate identification

16  of the relevant personnel within survey-respondent companies; it can involve some

17  complexity to determine who in the organization actually knows the market.  The

18  Jay Survey's attempt to solve this problem is less than half-hearted:  The survey

19  asks but a single question aimed at identifying the "right" interviewee within the

20  company:  It asks whether the person who took the phone call is "the person who

21  mainly decides what types or brands of computer software the company uses."  (Jay

22  Report, p. 9.)

23      The question is not only simplistic but ambiguous and potentially confusing.

24  When more than one person has a role in procurement, which person is the "main"

25  person?  Is it the CEO who authorizes the expenditure?  The accounts-payable

26  manager who cuts the check?  The IT manager who surveyed the market and

27  recommended the purchase but did not actually make the decision to purchase?  Is

28  "deciding" different from "recommending"?

1    Certainly there were more probing questions that the Jay Survey could have
2    asked – e.g., "Who in your company is involved in software-purchase decisions?"
3    or "Who would be the person to survey the market to learn what different software
4    solutions are available for a particular application?"  Or the interviewer could have
5    asked to speak to employees by title, armed with follow-up questions calculated to
6    ascertain that the person actually has the role in software procurement that the title
7    makes it *sound* as if he or she does.  But none of this was asked.  Instead, the survey
8    asked only the single, overly-broad-gauged and ambiguous question about who
9    "<u>mainly</u> decides."

10    Even if the Jay Survey's interviewee-qualifying protocol had been adequate
11    to identify the right companies, it surely was not adequate to identify the right
12    *interviewees.*  For this reason alone, the survey's reliability is fatally compromised.

### 3.   The Jay Survey's "Secondary Meaning" Question Failed Reliably to Focus the Respondents on the Correct Issue

15    Where, as here, a question abruptly goes "straight to the punch line" – i.e.,
16    "Do you associate [clamed trademark] with [product identification] of one, or more
17    than one, company?" – the question invites guessing, particularly by respondents
18    who associate the trademark with *no* company because they simply are not familiar
19    with the trademark.  To avoid this, one author has suggested that there be
20    preliminary questions, such as:  "Are you familiar with [claimed trademark]?" or
21    "Have you seen, or heard of, [claimed trademark]"?  *See* Vincent N. Palladino,
22    *Surveying Secondary Meaning,* 84 Trademark Reporter 155, 168 (1994).

23    The Jay Survey could, and should, have asked preliminary questions to
24    ascertain whether the respondent had seen the mark RUN SMARTER at all.  It
25    could, for example, have asked, "Are you familiar with the slogan RUN
26    SMARTER used in connection with software?"  In failing to ask such a question,
27    the survey failed to screen out those who were not familiar with the mark at all, and
28    so could only guess whether it might be associated with one company or another, or

1   more than one.  As it was, the question did not even make clear that it was inquiring

2   about use of RUN SMARTER as a commercial slogan at all.

3        **4.     The Survey Suffers From Other Indicia of Unreliability**

4        An inherent disadvantage of telephone surveys is that they make it

5   impossible to display the mark to the survey respondent in its commercial context;

6   naked words are the only stimulus.  *See*, *Cairns v Franklin Mint Co.,* 24 F. Supp. 2d

7   1013, 1041 (C.D. Cal. 1998);  *Schieffelin & Co. v Jack Co. of Boca,* 850 F. Supp.

8   232, 240 (S.D.N.Y. 1994).  The lack of ability to show respondents the mark as

9   used in commerce is a factor that tends to lessen the weight of a telephone survey

10  but will not, by itself, render the survey inadmissible.  But here the lack of ability to

11  display the mark in context is compounded by the survey question's failure to

12  communicate to the respondent that the question was about commercial promotion

13  or advertising at all.  The question was entirely abstract.  The reference to the mark

14  as "words in the abstract, without any visual clues as to the use of the mark in print

15  or online advertisements"  was "designed to mislead respondents by explicitly

16  suggesting the mark at issue was simply words or a phrase" (Compulink's Rebuttal

17  Report, p. 2). Moreover, although the Jay Report emphasizes "Run Smarter" by

18  putting it in caps and quotes, the survey questionnaires provided no way to impart

19  that kind of emphasis to the slogan, making the telephone survey all the more

20  inadequate to show the mark in any way that duplicates, or even fairly stimulates,

21  the actual commercial context in which the accused infringer used it.

22       In these circumstances, the failure to show the mark in its commercial

23  context should be held not merely to lessen the *weight* of the survey, but to render it

24  unreliable to the point of inadmissibility.  *See Kournikova v General Media*

25  *Communications, supra,* 281 F. Supp. 1111, 1125 (C.D. Cal. 2003) [consumer-

26  perception survey inadmissible for reasons including  its failure to allow

27  respondents to see the complained-of matter in context; they were only allowed to

28  view photos of the magazine's cover and spine – not the magazine photos

1   themselves, nor the accompanying article].

2        Further, the Jay Survey suffers from the lack of any pilot survey or other pre-

3   test of the questions to ascertain their reliability.

4        Moreover, given that the average purchaser of Laserfiche's software is an

5   enterprise of substantial size (typically in the neighborhood of over 3,000

6   employees) , it seems questionable on the face of the matter whether the "main"

7   decision maker on a large software purchase would be easily be available in

8   response to a random phone call from a stranger.[2]

9        Taken together, these defects should be held to render the Jay Survey too

10  unreliable to be admitted as proof.  As Compulink's Rebuttal Report notes (p. 12),

11              What the survey shows is that: when mostly non-IT

12              personnel of generally small companies are asked if they

13              associate the words "run smarter" with computer software

14              that lets them access and share electronic data, the

15              respondents are overwhelmingly confused and mostly

16              think of hardware makers.

17  The survey and all testimony about it should be excluded in limine.

18        **5.    SAP, by its Arguments Against a Compulink Expert, has**

19              **Called Into Question Dr. Jay's Qualifications**

20        In a July 29, 2011 letter setting forth its motion in limine positions, SAP's

21  counsel asserted that Compulink's confusion expert, Dr. Burnett, is unqualified in

22  part because, although SAP seems to concede that he has expertise in the consumer-

23  behavior-related fields of marketing and advertising, "there is … no indication that

24  [he] has experience or expertise in the field of document and image management

25  software, or even enterprise software generally."  (Letter at 4.)  This is an

26  astonishing position for SAP to take, not only because SAP cites no authority for it

27

28

---

[2] SAP has also admitted in responses to Requests for Admissions that the average purchaser of SAP's competing software is a company of over 500 employees.

1   but also because precisely the same must be said of Dr. Jay.  In fact, Dr. Jay's lack

2   of actual technical experience in the industry may be the reason why her product

3   definitions are so vague, so over-broad, and so contrary to the industry-accepted

4   meanings of the terms she used.  But if the court were somehow of the view that

5   Dr. Burnett should be disqualified for on grounds if industry inexperience, the same

6   would be true *a fortiori* of Dr. Jay.

7        **6.    The Jay Report Should Be Excluded, And The Witness's**

8              **Testimony Barred, For Failure To Make Adequate Rule 26**

9              **Disclosures**

10         On August 5, 2011 – the very day this submission from Compulink is due –

11   an astonishing thing happened.  Although the Report's "companies with 10 or more

12   employees" statement is clear on its face, Dr. Jay, at her deposition given on August

13   5 – and a ***full month after*** the date of Compulink's Rebuttal Report based on the

14   Jay Report -- attempted to retreat from that plain language.  Dr. Jay now insists that

15   when she said "companies with 10 or more employees" what she really meant was

16   "company *locations* with 10 or more employees."  If this is so, then the Jay Report

17   materially misstates the bases and reasons for the witness's opinions and the facts

18   or data considered, in contravention of expert-report requirements of F. R. Civ. P.

19   26(a)(2(b)(i) and(ii).  The misstatement cannot be called either immaterial or

20   harmless, for it was relied upon in preparing Compulink's Rebuttal Report.  For this

21   reason without more, the Jay Report should be stricken and the witness barred.

22         But even if we accept as true the newly-revealed premise that Dr. Jay

23   surveyed "company *locations* with 10 or more employees," the same criticisms that

24   are set forth in Compulink's Rebuttal Report and in this motion are still

25   substantially sound.  To the extent that she surveyed companies with only one

26   location, it would still be true, or likely, that the sample included companies having

27   only ten employees – much too small to have any likely interest in the software of

28   interest here.  And to the extent that she surveyed small-population offices (as few

as 10 employees) of larger companies that had multiple locations, it seems dubious that the persons she reached in those small office locations would have been the ones responsible for large, sophisticated company-wide software purchase decisions.  And, so far as the Report shows, she made no attempt to distinguish between headquarters locations and small-outlying branch offices.  Hence, even if Dr. Jay's change of story about company size and location is taken at face value, it still must be said that the survey failed to address the correct population.

**B.      Even If It Could Pass Muster Under FRE 702, The Jay Survey And Any Testimony Based Thereon Would Be Irrelevant, At Least To The Registered-Trademark Branch Of The Case**

Even if the Jay Survey otherwise met the tests of admissibility, it would remain to be said that the issue of secondary meaning, itself, is of limited and doubtful relevance in a registered-trademark-based case.

As noted in *Applied Information Sciences Corp. v eBay, Inc.,* 511 F. 3d 966, 969-70 (9th Cir. 2007), there are three distinct ways in which a mark may be shown to be distinctive: (1)  If the mark is a merely descriptive term, it may be shown to have, through use and exposure, gained "acquired distinctiveness"  (called "secondary meaning"); (2) it may possess inherent distinctiveness (i.e., it may be "suggestive" or it may be "arbitrary or fanciful"), in which case secondary meaning need not be shown in order to establish that the mark is distinctive; and/or (3) the mark may be registered on the principal register, in which case its distinctiveness is presumed and, again, secondary meaning need not be shown.  In this case, "RUN SMARTER" is presumed distinctive of Compulink's goods for reason #3: It is registered and it was allowed by the PTO without any required showing of secondary meaning.  Even were that not so, it would have to be said that "RUN SMARTER" is distinctive for reason #2:  It is not merely descriptive of

Compulink's software but is instead suggestive,[3] and therefore inherently distinctive, so that acquired distinctiveness (secondary meaning) need not be addressed.[4]

It seems to be SAP's position that the description of goods in Compulink's registration does not cover SAP's software, and that therefore Compulink is not entitled to the presumption of exclusive right that comes with registration and must rely on a theory of common-law trademark infringement, under which the burden is on Compulink to demonstrate secondary meaning. If this is SAP's position, then SAP faces a threshold problem: SAP offers no support for its premise that the software that SAP advertised and marketed in association with the RUN SMARTER mark falls outside the description of goods appearing in Compulink's trademark registration for RUN SMARTER – a description that is broad on its face and which, by law, must be given a broad construction.[5]

Even if SAP were correct that its software falls outside the RUN SMARTER registration's description of goods, SAP's position still would be untenable because SAP confuses the scope of a trademark's **coverage** with the scope of the **remedy** available for infringement of that mark. As explained in *Allied Information, supra,* (511 F. 3d at 971),

> "the scope of validity and the scope of relief for
> infringement [of a registered mark] are not coextensive."
> …. "Thus a trademark owner may seek redress if

---

[3] The reasons why RUN SMARTER is suggestive, rather than generic or merely descriptive, are discussed in detail in Compulink's Motion in Limine #2.

[4] *See Applied Information, supra,* 511 F. 3d at 970:" Because we conclude that AIS established [by registration] a valid, protectable interest in the mark on which it based its trademark infringement action, we need not address AIS's arguments that it established such an interest because the mark had acquired secondary meaning or was suggestive. "

[5] This point is discussed in Compulink's response to SAP's Motion in Limine #9.

1          another's use of the mark on different goods or services is

2          likely to cause confusion with the owner's use of the mark

3          in connection with its registered goods."

4   The court continued (511 F. 3d at 972-73):

5          "Here, AIS alleged infringement of a mark it used in

6          connection with the kind of products specified in its

7          federal registration: "computer software and instruction

8          manuals sold together" that allow users to retrieve

9          information online. Whether or not eBay ever used the

10         SmartSearch mark in connection with goods specified in

11         AIS's registration is irrelevant to the question of whether

12         AIS established a valid, protectable interest.  By virtue of

13         its federal registration, AIS discharged its burden of

14         establishing the validity of the SmartSearch mark in virtue

15         of its federal registration; AIS discharged its burden of

16         establishing the validity of the SmartSearch mark in

17         connection with those goods listed in the registration.

18         Whether eBay's use of SmartSearch infringed AIS's

19         protected interest then becomes a question of *likelihood of*

20         *confusion*.

21      To the extent that the one and only topic of the Jay report – a purported lack

22  of secondary meaning -- could possibly be relevant in this case, the Jay Report, and

23  testimony based thereon, should be rejected as proof thereof, for the reasons noted

24  above.

25

26

27

28

1

## SAP'S RESPONSE TO COMPULINK'S MOTION IN LIMINE #1[6]

2         Compulink's motion in limine to exclude SAP's survey expert, Dr. Deborah

3   Jay, President and CEO of Field Research, a well-established and well respected

4   marketing and public opinion firm, contravenes Ninth Circuit law and otherwise

5   misconstrues the survey, the issues to be tried in this case, and the admissible facts.

6         First, Compulink asserts that secondary meaning is not relevant to this

7   proceeding because Compulink owns a federal trademark registration for RUN

8   SMARTER.  Compulink's premise is wrong and so is its conclusion.  Compulink's

9   federal registration is, at best, contestable (15 U.S.C. §1064) and its validity is

10  directly at issue in this litigation.  Nonetheless, evidence regarding the secondary

11  meaning of "Run Smarter" is relevant to issues beyond the validity of the "Run

12  Smarter" trademark registration, including the following: (1) Compulink's

13  registration merely provides a *rebuttable* presumption of validity that SAP can

14  overcome with evidence, such as the results of Dr. Jay's secondary meaning survey;

15  (2) Compulink claims trademark rights that exceed the specific goods specified in

16  its registration, requiring a showing of secondary meaning if Compulink chooses to

17  rely on its use for broader goods under common law; (3) the survey provides

18  probative evidence of the strength of Compulink's mark, which is relevant to the

19  likelihood of confusion analysis; (4) the survey provides probative evidence of

20  whether the use of "Run Smarter" is material to software purchasing decisions for

21  purposes of Compulink's false advertising claim; (5) the survey provides probative

22  evidence of whether "Run Smarter" is famous for purposes of Compulink's dilution

23

24  [6] Compulink did not provide to SAP a proper letter setting forth its five motions in
    limine.  Instead, its letter specified six motions in limine and cited no case law, as
25  required by the Amended Scheduling and Case Management Order of the Court,
    dated March 9, 2011 ¶5.  Declaration of Brian M. Hom in Support of SAP's
26  Opposition Motions in Limine 1-5 ("Hom Decl.") ¶ 11, Ex. 10.  Despite being
    notified of both deficiencies, Compulink chose not to provide dispositive law so
27  that a meaningful conference could be held.  Instead, Compulink took the position
    that legal authority need not be provided.  Such an interpretation ignores the
28  specific language of the Court's Order that states that "legal authority which the
    moving party believes is dispositive" should be provided in the letter.  *Id.* at 11-12.

1  claim; and (6) the survey provides probative evidence of whether "Run Smarter"

2  has become generic, which directly bears on SAP's trademark invalidity claims.

3        Secondly, Compulink's methodological challenges are both incorrect,

4  because such challenges go to the weight to be of the secondary meaning survey

5  Field Research conducted under the supervision of Dr. Jay, rather than the survey's

6  admissibility.  Dr. Jay's report demonstrates that the survey was conducted using

7  established survey methodology and a proper universe.  For example, although

8  Compulink argues the companies surveyed are too small, the companies surveyed

9  are all in the top 9% of U.S. companies with respect to employee size.  Moreover,

10  on its web site, Compulink markets its products to small and mid-size companies,

11  including "sole proprietorships" or "organizations with a workforce as small as

12  one."  In any event, the survey results do not differ when viewed by company size.

13        For each of these reasons, separately and combined, Dr. Jay's report and

14  testimony is relevant and admissible.  As a recognized and experienced survey

15  expert, Dr. Jay is entitled to testify about the survey and its results.  SAP

16  respectfully requests, therefore, that the Court deny Compulink's Motion in Limine

17  No. 1 in its entirety.

18  **I.      FACTUAL BACKGROUND**

19        *Dr. Jay's Experience*

20        SAP's survey expert, Dr. Deborah Jay, is the President and CEO of Field

21  Research, a well-respected marketing and public opinion firm.  Declaration of Brian

22  M. Hom in Support of SAP's Opposition to Motions in Limine ("Hom Decl.") ¶ 29,

23  Ex. 28, 2011 Computer Software Survey ("Run Smarter") Report of Dr. E. Deborah

24  Jay ("Jay Report") at 1, 3.  Dr. Jay is unquestionably qualified to serve as an expert

25  for the purposes of testifying on trademark surveys.  Dr. Jay has over 30 years of

26  experience conducting surveys and has been qualified as an expert by numerous

27  federal and state courts as an expert on survey methodology.  *Id.* at 3-6.  Dr. Jay has

28  conducted over 100 surveys in connection with trademark disputes, including many

1   secondary meaning surveys.  *Id.* at 4.  Indeed, one of Dr. Jay's trademark surveys

2   was previously deemed admissible by this Court.  *Ugg Holdings, Inc. v. Severn*,

3   2005 WL 5887187, *5 (C.D. Cal. 2005).  Dr. Jay has also widely lectured on

4   survey methodology and held leadership positions in associations devoted to issues

5   related to opinion and market research.  Hom Decl. ¶ 29, Ex. 28, Jay Report at 4.

6   Even Compulink's own witness recognizes Dr. Jay as an expert.  Hom Decl. ¶ 3,

7   Ex. 2, Deposition of John Burnett ("Burnett Dep.") at 54:12-20.

8         Moreover, Dr. Jay's testimony falls within her claimed area of expertise –

9   surveys.  Indeed, Dr. Jay has done business software surveys previously, as noted in

10  her report and deposition.  Hom Decl. ¶ 27, Ex. 26, Deposition of Deborah Jay

11  ("Jay Dep.") at 83:19-84:3,123:3-5, 174:24-175:2, 218:6-22.  Dr. Jay's

12  qualifications contrast directly with those of Dr. Burnett , who has never undertaken

13  a secondary meaning survey, and who opines, for example, that Compulink and

14  SAP are competitors, in part because they have the same customers, although he

15  had no information or basis for such an opinion and could not identify *any* SAP or

16  Compulink products or *any* customers to whom both companies sell the same

17  products (Hom Decl. ¶ 3, Ex. 2, Burnett Dep. at 50:3-18; 100:21-23, 103:12-22).

18        *The Survey*

19        Between April 18 and May 11, 2011, Field Research conducted a survey

20  under Dr. Jay's supervision to determine whether software decision makers

21  associate the word or phrase RUN SMARTER with computer software from

22  Compulink, or, in the alternative, with a single anonymous source.  Hom Decl. ¶

23  29, Ex. 28, Jay Report at 1.  Dr. Jay supervised a double-blind telephone survey of

24  311 randomly selected software decision makers in eligible companies (including

25  private corporations, nonprofit organizations and public agencies) with ten or more

26  employees at a location that buy, license or upgrade document or records

27  management software, enterprise content management software, or document

28  imaging or forms capture software.  *Id*. at 1, 2, 7; Hom Decl. ¶ 27, Ex. 26, Jay Dep.

at 54:23-55:8.  These companies constituted the top 9% of companies in the United States.  Hom Decl. ¶ 29, Ex. 28, Jay Report at 7.

When a randomly selected company was first reached (normally by contacting the Chief Technology Officer) (Hom Decl. ¶ 27, Ex. 26, Jay Dep. 98:22-99:11, 100:21-22), the interviewer provided a brief statement about the survey and inquired whether the company used computers at the location and, if so, asked to speak with the person who <u>mainly</u> decides what types or brands of computer software the company uses.  *Id.* at 98:2-11, 99:6-11, 101:22-102:2; Hom Decl. ¶ 29, Ex. 28, Jay Report at 9.  To be eligible for the survey, the software decision maker had to indicate that the company either bought, licensed or upgraded the relevant software in the past 12 months or intended to do so in the next 12 months.  Hom Decl. ¶ 29, Ex. 28, Jay Report at 9.  The specific question asked was:

- "In the past 12 months, did your company buy, license or upgrade any of the following types of computer software products?
  - **Document or records management software**, that is, software for classifying, storing, securing, preserving or tracking electronic documents or records?
  - **Enterprise content management software**, that is software that allows employees to access and share your company's stored electronic data?
  - **Document imaging or forms capture software**, that is, software for capturing, storing and reprinting images of paper documents or converting documents into digital information?"

A virtually identical question was asked regarding the company's intent to buy, license or upgrade software in the next 12 months.  Jay Report at 9-10.  In order to reach the proper person, interviewers were instructed to call numerous times.  Hom Decl. ¶ 27, Ex. 26, Jay Dep. at 101:8-9; Hom Decl. ¶ 29, Ex. 28, Jay Report at 10.

1  After a company was determined to be eligible, the software decision maker

2  was asked:

3  • "My next question concerns the words or phrase 'RUN SMARTER.'

4  Do you associate the words or phrase 'RUN SMARTER' with

5  computer software from any particular company or companies?"

6  ○ (IF YES) "With what company or companies?"

7  ○ (IF DIDN'T KNOW COMPANY NAMES) "Do you associate

8  the words or phrase 'RUN SMARTER' with computer software

9  (from one company or more than one company) (from more

10  than one company or one company)?"

11  Hom Decl. ¶ 29, Ex. 28, Jay Report at 10.  Altogether 1,641 companies were

12  screened for eligibility, 311 were determined eligible and completed the interview.

13  *Id*. at 11.

14  Dr. Jay found that only 10% of software decision makers who were asked

15  these questions said they associated "RUN SMARTER" with computer software

16  from any particular company or companies.  *Id*. at 13-14.  None of the software

17  decision makers said they associated "RUN SMARTER" with Laserfiche (*Id*. at 3,

18  14) and only **1%** of software decision makers associated "RUN SMARTER" with a

19  single anonymous source.  *Id*. at 3, 15.

20  The survey results did not differ based on size of company surveyed.  Jay

21  Dep. at 83:11-14 ("I believe none of the companies with more than 25 employees,

22  which represent the three percent largest companies in the US, associated run

23  smarter with Laserfiche or with a single anonymous source"); Hom Decl. ¶ 27, Ex.

24  26, Jay Dep. at 89:16-90:2 (the survey results for the top three percent support the

25  same conclusion as the overall results).  Similarly, the survey results remain

26  unchanged when the results are evaluated by each of the separate software

27  definitions provided or by the job title of the respondent.  *Id*. at 121:5-16 (people

28  who had a technology title "did not identify run smarter with a single source or a

1    single anonymous source, nor did company managers"). *See also Id*. at 127:23-

2    128:14.

3    **II.    ARGUMENT**

4         **A.    Lack of Secondary Meaning Is Probative of Multiple Issues**

5         Dr. Jay's survey is highly relevant and probative to multiple issues in this

6    case.  Compulink alleges that SAP has infringed its trademark rights in the words

7    "Run Smarter."  To claim trademark infringement, a plaintiff must have a "valid,

8    protectable trademark."  *Brookfield Communications, Inc. v. W. Coast*

9    *Entertainment Corp.*, 174 F.3d 1036, 1046 (9th Cir. 1999).  To be valid and

10   protectable, a mark must be distinctive.  *Zobmondo Entertainment, LLC v. Falls*

11   *Media, LLC*, 602 F.3d 1108, 1113 (9th Cir. 2010).  Generic marks and marks that

12   are merely descriptive and have not acquired distinctiveness as used in connection

13   with the plaintiff's goods or services are not distinctive.  Thus, if plaintiff's "Run

14   Smarter" mark is generic or merely descriptive and without distinctiveness,

15   plaintiff's claims for trademark infringement must fail.  *See Tie Tech, Inc. v.*

16   *Kinedyne Corp.*, 296 F.3d 778, 783 (9th Cir. 2002) ("there can be no infringement

17   of an invalid mark.").  A Registration does not change this analysis.  *Id.*

18        It is well-established that a *contestable* trademark registration only affords a

19   *rebuttable* presumption that the mark has secondary meaning.  *See Vuitton et Fils*

20   *S.A. v. J. Young Enterprises, Inc.*, 644 F.2d 769, 775–76 (9th Cir.1981)

21   (presumption of validity of a registered mark can be overcome by a preponderance

22   of the evidence); *Tie Tech,* 296 F.3d at 783 (9th Cir.2002) ("Once the presumption

23   of validity is overcome, however, the mark's registration is merely evidence 'of

24   registration,' nothing more").  Despite Compulink's contentions, a registration, and

25   particularly a contestable registration, does not provide an unchallengeable

26   monopoly.  Moreover, any applicable presumption is limited to the goods and

27   services specified by the registration certificate.  Lanham Act § 33(a), 15 U.S.C.

28   § 1115(a); *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1354 (9th Cir.

1985).  Once a defendant demonstrates that the mark is invalid, the presumption of validity is pierced and the registration loses evidentiary significance.  *See Tie Tech,* 296 F.3d at 783 ("In trademark terms, the registration is not absolute…"). And, to the extent Compulink contends that it has protection for goods beyond what is covered by the registration, no presumption exists.  *Levi Strauss*, 778 F.2d at1358.

In addition, secondary meaning (acquired distinctiveness) is relevant to the strength of the mark element of the likelihood of confusion analysis, even where the mark is the subject of a trademark registration.  *Miss World (UK) Ltd. v. Mrs. Amer. Pageants, Inc.,* 856 F.2d 1445, 1449 (9th Cir. 1988) (holding that the degree of recognition of the mark in the marketplace is relevant to determining the strength of a mark, even where the party owns an incontestable registration) *(abrogated in part on other grounds).* The Ninth Circuit recognized that an expert survey of purchasers can provide "the most persuasive evidence on secondary meaning." *Levi Strauss*, 778 F.2d at 1358 (affirming district court's holding that there was no secondary meaning based on survey that showed that a substantial segment of purchasing population did not associate plaintiff's mark with a single source).

Dr. Jay's survey measured whether software decision makers at private companies, nonprofit organizations, and public agencies with 10 or more employees at a location associate the words "RUN SMARTER" with computer software from Compulink or with any single source.  In other words, the purpose of the survey was to determine whether Compulink's "RUN SMARTER" mark has acquired distinctiveness within the relevant market.  Dr. Jay's survey is thus not only relevant to the issue of whether the "RUN SMARTER" mark has acquired distinctiveness, but is "the most persuasive evidence" on that issue. *See Levi Strauss*, 778 F.2d at 1358.

Compulink argues that evidence regarding whether the "RUN SMARTER" mark has acquired distinctiveness is irrelevant because Compulink believes "RUN SMARTER" is inherently distinctive for computer software because it is

1   "suggestive."  Compulink's characterization and contention belie the facts.  No

2   determination has been made regarding the distinctiveness of Compulink's mark

3   and no case law provides that a registration alone is determinative.  The

4   characterization of a mark as generic, descriptive, or suggestive is a question of fact

5   for the jury to decide.  *Builders Square Inc. v. Wickes Co., Inc.*, 1985 U.S. Dist.

6   LEXIS 16256, *18 (C.D. Cal. Sept. 4, 1985)   Second, it is well-established law that

7   when the purported trademark owner, as here, does not exclusively use the mark as

8   a source identifier,  it "is strong evidence of genericness, let alone descriptiveness"

9   (*e.g.* Hom. Decl. ¶¶ 23-24, Exs. 22, 23 ("Laserfiche® creates simple and elegant

10  document solutions that help organizations run smarter."); Hom Decl. ¶ 19, Ex. 18,

11  Deposition of Thomas Wayman at184:16-20, 220:10-14, 239:15-20).  *Retail Servs,*

12  *Inc. v. Freebies Publ'g*, 364 F.3d 535, 545 (4th Cir. 2004 (quoting McCarthy

13  §12:13); *CG Roxane LLC v. Fiji Water Company LLC,* 569 F. Supp.  1019, 1029

14  (N.D. Cal. 2008) (as to "Bottled At The Source" "a kind of estoppel arises when the

15  proponent of a trademark…itself use[s] the term before the public as a generic

16  name.").

17          Further, Dr. Jay's testimony and survey are also probative of genericness if

18  words that are allegedly a trademark are not identified with any specific company.

19  *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc*. 419 F.3d 925, 929

20  (9th Cir. 2005); McCarthy §12:46.  Thus, SAP should be permitted to present

21  relevant evidence on this issue, including evidence regarding the survey Dr. Jay

22  conducted.  Moreover, the survey is probative evidence germane to other issues,

23  including Compulink's dilution and false advertising claims, the strength of Run

24  Smarter as it pertains to likelihood of confusion, and SAP's trademark invalidity

25  claims.  *See Milbank Tweed Hadley & McCloy LLP v. Milbank Holding Corp*.,2007

26  WL 1438114 * 5(C.D.Cal. 2007); *Miss World (UK) Ltd.,* 856 F.2d at 1449

27  (secondary meaning relevant to strength of mark in likelihood of confusion

28  analysis).

**B.     The Jay Survey Is Reliable and Was Conducted According to Accepted Principles**

In the Ninth Circuit, it is well established that a survey should be admitted if probative and conducted according to accepted principles. *M2 Software, Inc. v. Madacy Entertainment*, 421 F.3d 1073, 1087 (9th Cir. 2005); *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1263 (9th Cir. 2001). Dr. Jay's survey is admissible because, as discussed above, it is probative of the central issue in this case – whether Compulink has a valid trademark right. It is also probative of other issues in this case, including trademark strength, dilution, genericness, and false advertising. Further, the survey was conducted according to accepted survey principles and methodologies.

Compulink's motion in limine to exclude Dr. Jay's survey fails to provide any credible arguments or evidence, even indicating that the survey is unreliable. Contrary to Compulink's assertions, Dr. Jay conducted a valid survey drawn from a representative sample of the relevant population. The survey was performed in conformity with the standards set forth in the Federal Manual for Complex Litigation, 4th Ed. § 11.493 (2004) and the Federal Reference Manual on Scientific Evidence, 2nd Ed. § 7 (2000). Hom Decl. ¶ 29, Ex. 28, Jay Report at 2. Dr. Jay found that the survey contained no "noise" (Hom Decl. ¶ 27, Ex. 26, Jay Dep. at 64: 7-8, 65: 9-13) and employed appropriate quality control procedures, including a written structured questionnaire, a full filter first question to determine whether survey respondents associated "RUN SMARTER" with computer software from any particular company or companies, a simple, straightforward open-ended question, informing respondents they could answer that they did not know, and using only professionally trained interviewers, who were supervised. Hom Decl. ¶ 27, Ex. 26, Jay Dep. at 64:10-66:12. A control question or control group was not necessary for this survey because no respondent's referred to any one particular company with any frequency. *Id*. at 67:12-69:8, 70:19-24. Although Compulink

1  argues that the survey should have asked a question to screen for those familiar

2  with the mark, this method has been called into question by other courts as

3  "stacking the deck" in the favor of the purported mark owner.  *See I.P. Lund*

4  *Trading v. Kohler Co.*, 118 F.Supp.2d 92, 108-109 (D. Mass. 2000).

5      Dr. Jay selected a telephone survey instead of a face to face interview

6  because telephone surveys are the common method of conducting secondary

7  meaning surveys where there is no design component or trade dress at issue,

8  particularly in the business to business context.  Hom Decl. ¶ 27, Ex. 26, Jay Dep.

9  at 204:9-205:18.  As Compulink acknowledges (*supra* at 11), the selection of a

10  telephone survey goes only to the weight, rather than the admissibility.  *Cairns v.*

11  *Franklin Mint Co.*, 24 F.Supp.2d 1013, 1041 (C.D. Cal. 1998).  And, here, the

12  interviewers made numerous attempts to reach the identified respondent at each

13  company, obviating any concern that the appropriate decision makers might not be

14  easily available.  Hom Decl. ¶ 27, Ex. 26, Jay Dep. at 102:11-22.

15      Compulink insinuates that Dr. Jay committed some impropriety when she

16  stated in her deposition that the companies surveyed had ten or more employees *at*

17  *the specific location*, but that information was not newly-revealed at the deposition

18  as claimed.  Dr. Jay's testimony merely provided clarification of a fact already

19  stated in Dr. Jay's report to anyone familiar with how business to business surveys

20  are conducted, namely, that the enhanced Dun and Bradstreet business database

21  offered by Marketing Systems Group, Inc. ("MSG") referenced in Dr. Jay's Report

22  selects businesses by location size, rather than overall company size.  Hom Decl.

23  ¶ 27, Ex. 26, Jay Dep. at 81:20-22; Hom Decl. ¶ 29, Ex. 28, Jay Report at 7.

24  Moreover, the report reveals that those companies are the top 9% of the companies

25  in the United States with respect to employee size. Hom Decl. ¶ 27, Ex. 26, Jay

26  Dep. at 220:14-17; Hom Decl. ¶ 29, Ex. 28, Jay Report at 7.

27      Significantly, Compulink does not dispute the coding of any of the survey

28  responses or any of the numbers in the data tables provided in Dr. Jay's expert

1    report.  Nor does Compulink provide any alternate analysis of the survey data that

2    contradicts Dr. Jay's findings or conclusions.  Indeed, Complink has not basis for

3    arguing that the survey results would have come out differently if some other

4    universe were used.  Revealingly, Compulink has not come forth with a survey

5    probative of any of the issues being litigated in this case.  For all of these reasons,

6    SAP should be permitted to present evidence regarding Dr. Jay's survey.

7          **C.      Any Alleged Methodological Errors Are Relevant Only to the**

8                    **Survey's Weight, Not Its Admissibility**

9          Compulink also seeks to exclude Dr. Jay's report and survey due to alleged

10   methodological errors.  Issues related to methodology and survey design, however,

11   only go to the weight of the evidence not to the survey's admissibility.  *Prudential*

12   *Ins. Co. of Am. v. Gibraltar Fin. Corp.*, 694 F.2d 1150, 1156 (9th Cir.1982); *Clicks*

13   *Billiards,* 251 F.3d at 1263 ("issues of methodology, survey design, reliability, the

14   experience and reputation of the expert, critique of conclusions, and the like go to

15   the weight of the survey rather than its admissibility").  Specifically, questions

16   about the propriety of the selection of the survey universe go to the weight afforded

17   the survey and not the admissibility of the survey.  *Icon Enters. Int'l, Inc. v. Am.*

18   *Prods. Co.*, 2004 U.S. Dist. LEXIS 31080, *88 (C.D. Cal. Oct. 7, 2004) (ruling that

19   survey was admissible and probative despite questions about appropriateness of

20   survey universe); *A&M Records, Inc. v. Napster, Inc.*, 2000 U.S. Dist. LEXIS

21   20668, 2000 WL 1170106, *3-4 (N.D. Cal. Aug. 10, 2000) (same); *Cairns v.*

22   *Franklin Mint Co.*, 24 F. Supp. 2d 1013, 1040 (C.D. Cal. 1998) (same).  Under the

23   circumstances, even if Compulink's unfounded critiques of the survey are deemed

24   accurate (which SAP fully disputes below), there is simply no legal support for

25   excluding the survey evidence from trial. [7]

26   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [7] On August 24, 2011, the day before the deadline for filing all joint motions in
27   limine (in addition to the Final Pretrial Order and proposed jury instructions, among
     other things), Compulink served materially revised versions of all of its motions in
28   limine that include arguments and case law that were never cited in the letter
     required in advance of in limine motions under section 5 of the Court's Amended

1    *The Survey Universe*

2         Compulink begins its claims of survey error by alleging that the universe for

3    the survey is inadequate because it consisted of private companies, nonprofit

4    organizations, and public agencies with 10 or more employees at a location.

5    However, the companies interviewed in the survey are not small companies, but

6    instead represent the top 9% of companies in the United States with respect to

7    employee size.  Hom Decl. ¶ 27, Ex. 26, Jay Dep. at 220:14-17; Hom Decl. ¶ 29,

8    Ex. 28, Jay Report at 7.  Nor do the survey results differ among the larger company

9    locations surveyed.  Hom Decl. ¶ 27, Ex. 26, Jay Dep. at 83:11-14 ("I believe none

10   of the companies with more than 25 employees, which represent the three percent

11   largest companies in the US, associated run smarter with Laserfiche or with a single

12   _____

13   Scheduling and Case Management Order or in the initial versions of Compulink's
     motions in limine provided to SAP to prepare its response.  *See, e.g.,* pp. 4-6, 12-13,

14   supra.  As a result, the parties never met and conferred regarding the belatedly-
     raised issues as required by section 5 of the Order, and Compulink unfairly

15   deprived SAP of reasonable time to respond to its new arguments.  Indeed, the
     Court's Order does not permit any supplemental filing by either party.  Order at 18.

16       In its belatedly-revised motion, Compulink relies for the first time on two
     cases to argue that  although the long-standing rule in the Ninth Circuit is that

17   methodological flaws go to the weight of a survey, not its admissibility, the Court
     should hold that the Jay survey is an exception to that rule.  *See* pp. 4-6, *supra.*  Dr.

18   Jay's survey does not suffer from any methodological flaws and certainly not the
     types of flaws present in those case that were so pervasive that they deprived the
     surveys at issue of any probative value.  In both *Scott Fetzer Co. v. House of*

19   *Vacuums Inc.*, 381 F.3d 477 (5th Cir. 2004) and *Kournikova v. General Media*
     *Communications, Inc.*, 278 F. Supp. 2d 1111 (C.D. Cal. 2003), the courts concluded

20   that the surveys were not probative on the issue of the likelihood of confusion
     because they contained multiple, serious flaws.  In *Scott Fetzer*, there is no

21   indication that survey was even excluded, although the Fifth Circuit did criticize the
     survey for (1) asking a question that begs its answer by suggesting a link between

22   the parties and (2) selecting a universe that improperly consisted entirely of persons
     who had purchased the plaintiff's product rather than prospective purchasers of the

23   defendant's product.  *Scott Fetzer*, 381 F.3d at 488.  In *Kournikova*. the court
     excluded the survey when it (1) did not even attempt to survey potential consumers

24   of the product-at-issue and instead surveyed the general public; (2) did not permit
     the respondents to view all of the allegedly misleading material in the magazine-at-

25   issue; <u>and</u> (3) the question the survey sought to answer was not probative of the
     legal standard for determining whether there was a likelihood of confusion.

26   *Kournikova*, 278 F. Supp. 2d at 1125.  Dr. Jay's survey does not suffer from any of
     these flaws, let alone numerous significant flaws, and to the extent the Court

27   concludes that there are any flaws, the case law in the Ninth Circuit is clear than
     methodological flaws go to the weight rather than the admissibility of the survey.

28   *Clicks Billiards*, 251 F.3d at 1263

1    anonymous source"); Hom Decl. ¶ 27, Ex. 26, Jay Dep. at 89:16-90:2 (the survey

2    results for the top three percent support the same conclusion as the overall results).

3    Even Compulink's supposed "survey expert," Dr. Burnett acknowledged that there

4    was no evidence that a survey "corrected" for all of his criticisms would have had a

5    different result.  Hom Decl. ¶ 3, Ex. 2, Burnett Dep. at 150:6-11.

6         Nevertheless, Compulink concludes that the respondents in the Jay survey

7    would be highly unlikely to require, or have use for, the highly sophisticated

8    software that Compulink sells, relying solely on the report of Dr. Burnett and Mr.

9    Torres. What Compulink fails to disclose is that Dr. Burnett admitted that he did

10   not know whether any of the companies that employ the survey respondents were

11   likely to be in the market for Compulink or SAP software.  *Id*. at 84:15-19.

12   Moreover, Compulink conveniently ignores statements on its own web site

13   marketing its software to small to medium sized enterprises and even to "sole

14   proprietors" or "organizations with a workforce as small as one."  Hom Decl. ¶¶ 21-

15   22, Exs. 20, 21.

16        *The Survey's Product Definitions*

17        Compulink's allegations regarding the impropriety of the selected software

18   definitions and Dr. Jay's selection of interviewees are also inapposite.  As

19   Compulink is well aware, the software definitions were derived from Compulink's

20   trademark registration, its web site and its own references to its products and

21   services in the Complaint in this proceeding (Hom Decl. ¶ 27, Ex. 26, Jay Dep.

22   127:16-23, 136:8-137:3, 137:12-25).  The questions were asked of qualified

23   software decision makers and there was no indication that they did not understand

24   the definitions.  *Id*. at 150:15-19.

25        Although Compulink argues the definition for enterprise content

26   management software was overly broad and would include, for example, e-mail

27   software, less than 10% of the companies screened said they had or would purchase

28   enterprise content management software in the past year.  This figure does not align

1  with the numbers Dr. Jay would expect if the respondents believed the definition

2  for enterprise content management included e-mail.  *Id*. at 141:12-142:9.  Nor do

3  the survey results change when the results are evaluated by each of the separate

4  software definitions.  *Id*. at 127: 23-128:14.  And references to Microsoft or other

5  companies in the results are not reflective of any error.  Microsoft, for example, is

6  listed in the "leader quadrant" in the 2009 Gartner Magic Quadrant Enterprise

7  Content Management report on which Compulink has extensively relied in this

8  proceeding.  Hom Decl. ¶ 26, Ex. 25.  HP (and thereby Compaq , which HP

9  acquired) is also listed in the 2009 Gartner Magic Quadrant Enterprise Content

10  Management report, appearing in the same "niche" quadrant as Laserfiche.  *Id*.

11      Likewise, the method used to determine the appropriate respondents for the

12  survey was appropriate.  The method used is a generally accepted approach for

13  identifying a decision maker in business to business surveys that has been

14  successfully used by Dr. Jay in other surveys in the past.  Hom Decl. ¶ 27, Ex. 26,

15  Jay Dep. at 188:22-25, 189:3-19.[8]   Revealingly, sorting the survey responses by job

16  title had no impact on the survey results.  *Id*. at 121:5-16 (people who had a

17  technology title "did not identify run smarter with a single source or a single

18  anonymous source, nor did company managers").

19      In all events, Compulink since it has chosen not to conduct any survey,

20  cannot demonstrate that any of these issues would have resulted in a different

21  outcome.

22  **III.   CONCLUSION**

23      For these reasons, SAP respectfully requests that the Court deny

24  Compulink's Motion in Limine precluding SAP from offering Dr. Jay's survey

25  results and her testimony relating thereto.

26  _____

[8] In *Autodesk, Inc. v. Dassault Systemes Solidworks Corp.*, No. C08-04397 WHA
27  (N.D. Cal, Dec. 30, 2009), Judge Alsup rejected a similar motion in limine to a
secondary meaning survey Dr. Jay conducted involving business software.  ("This
28  one deals with Deborah Jay.  This one is denied.  The criticisms go the weight; not
the admissibility.").  Hom Decl. ¶ 28, Ex. 27.

1

2

3    Dated:  August 25, 2011          LAW OFFICES OF ROBERT C. WEISS

4                                     MACEIKO IP

5                                     BUCHALTER NEMER
6                                     A Professional Corporation

7

8                                     By:  /s/ Michael L. Meeks
9                                          Michael L. Meeks
                                           Attorneys for Plaintiff
10                                         COMPULINK MANAGEMENT
                                           CENTER, INC. dba LASERFICHE
11

12

13   Dated:  August 25, 2011          MORGAN, LEWIS & BOCKIUS LLP

14

15                                    By:  /S/ Rochelle D. Alpert
16                                         Rochelle D. Alpert

17                                         Attorneys for Defendants and
                                           Counterclaimants SAP America, Inc.
18                                         and SAP Global Marketing, Inc.

19

20

21

22

23

24

25

26

27

28